# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, COUNTY OF DENVER<br>STATE OF COLORADO<br>Denver City & County Building<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: December 8, 2019 12:49 PM<br>FILING ID: E6389F117DDF8<br>CASE NUMBER: 2019CV34661 |
| **Plaintiffs:**<br>TODD UBEL, Individually, and on Behalf of All<br>Others Similarly Situated,<br><br>v.<br><br>**Defendants**:<br>PROGRESSIVE DIRECT INSURANCE<br>COMPANY, J.D. POWER and MITCHELL<br>INTERNATIONAL, INC. | ▲COURT USE ONLY▲<br>_____<br>Case Number:<br><br>Division: |
| Kevin S. Hannon, #16015<br>THE HANNON LAW FIRM, LLC<br>1641 Downing Street<br>Denver, CO 80218<br>Tel: (303) 861-8800<br>Fax: (303) 861-8855<br>Email: khannon@hannonlaw.com | |
| **COMPLAINT AND JURY DEMAND** ||

## PLAINTIFF'S COMPLAINT

Todd Ubel ("Plaintiff"), on behalf of himself, and all others similarly situated (the "Class" or "Class Members"), by and through the undersigned counsel, complains of Defendants, Progressive Direct Insurance Company ("Progressive"), J.D. Power ("Power"), and Mitchell International, Inc. ("Mitchell") (collectively, "Defendants"), and alleges:

## PARTIES

1. Plaintiff, Todd Ubel, is an adult citizen of Fort Lupton, Weld County, Colorado.

2.      Plaintiff brings this action in his individual capacity and on behalf of all other persons similarly situated in the state of Colorado.

3.      Defendant Progressive Direct Insurance Company ("Progressive") is incorporated under the laws of the state of Ohio with its principal place of business in Mayfield, Ohio.  Progressive issued to Plaintiff a Colorado automobile liability insurance policy, including coverage for first-party total loss claims, which was in effect on the date of the total loss at issue.

4.      Defendant J.D. Power ("Power") is incorporated under the laws of the state of Delaware and has its principal place of business in Westlake, California.

5.      Defendant Mitchell International, Inc. ("Mitchell") is incorporated under the laws of the state of Delaware and has its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over each foreign Defendant because each Defendant directly or through an agent (a) transacted business in Colorado; (b) contracted to supply services in Colorado; (c) caused tortious injury by acts and omissions in this state; (d) caused tortious acts and omissions outside this state and regularly conducts and/or solicits business or engages in other persistent conduct or otherwise drives substantial revenue from the services rendered in this state; (e) caused injury in Colorado by breach of contract and/or tortious interference with contract; and (f) otherwise derived substantial revenue from the services used in Colorado.

7.      Venue is proper in Denver County pursuant to C.R.C.P. 98(c)(1) as the Defendants are all nonresidents.

## **NATURE OF THE ACTION**

8.      This class action arises from Defendants' systemic and intentionally wrongful and improper scheme to under-value total losses involving the vehicles of Progressive first-party insureds.

9.      Through its auto insurance policy contracts, Progressive has agreed to provide, *inter alia*, collision coverage for losses resulting from damage to insureds' vehicles (the Policy/Policies).  The Progressive Policy provides for adjustment and settlement of first-party total loss claims on the basis of actual cash value or replacement ("Actual Cash Value").

10.      Progressive has spent many tens of millions of dollars to market itself as a fair and honest insurance company. However, Progressive and its co-conspirators, Power and Mitchell, are not fair and honest in providing valuations to Progressive insureds whose vehicles have been involved in an accident and are determined to be a total loss.

11.      As alleged hereafter, Power and Mitchell have formed a partnership to provide total loss valuation reports to insurers such as Progressive.  Power and Mitchell call these reports Work Center Total Loss Vehicle Valuation Reports.  ("WCTL Reports").  Mitchel represents that Mitchell WorkCenter Total Loss gives insurers a statistically-driven, fully-automated, web-based total loss valuation system combining J.D. Power and Associates' data analysis and pricing techniques with Mitchell's recognized leadership in physical damage claims processing solutions.[1]

12.      Typically, insurers contract with Mitchell to receive the WCTL Reports which are prepared by this joint partnership, to the benefit of Mitchell and Power.

---

[1] https://www.mpower.mitchell.com/mitchell-total-loss-data-q2-2018/

13.     Progressive has contracted with Mitchell to receive such WCTL Reports. Through this partnership and Mitchell's agreement with Progressive, Progressive, Mitchell, and Power have engaged in a scheme to artificially deflate the value of first-party total loss claims to pay insureds substantially less than the actual pre-loss cash value of their total loss vehicles.

14.     Plaintiff and the putative class are Progressive Policy holders whose vehicles were determined by Progressive to be a total loss, and who have been subject to the Progressive, Power, and Mitchell scheme to artificially deflate the value of, and under-pay, their total loss claims.

15.     When Progressive entered into the Policies at issue in this case with Plaintiff and Class Members, Progressive knew, but failed to disclose to Plaintiff and the Class, that the WCTL Reports would wrongfully under-value their total loss vehicles.  Through this scheme, Progressive, Power, and Mitchell have engaged in unlawful conduct in violation of Colorado law, common law and their respective contractual obligations, which have uniformly damaged Progressive insureds in Colorado in a readily ascertainable dollar amount.

## GENERAL FACTUAL ALLEGATIONS

### A.     Plaintiff's Progressive Policy and Plaintiff's Total Loss

16.     Plaintiff Todd Ubel was the owner of a 2008 Nissan Armada SE (the "Vehicle").

17.     Progressive issued its Automobile Policy No. 80866811 (the "Policy") to Plaintiff which insured the Vehicle. That Policy was in effect in April 2019, and is attached hereto as Exhibit A.

18.     Following an automobile accident on July 28, 2019, Progressive determined that Plaintiff's Vehicle was a total loss.

19.     The terms of Progressive's Policy issued to Plaintiff are not individualized, unique or specific to Mr. Ubel.  Plaintiff's Policy is the same standard form issued by Progressive to its insureds throughout the state of Colorado.

20.     The Plaintiff's Policy requires Progressive to pay the "Actual Cash Value" of the total loss Vehicle, under Section IV "Damage to Vehicle," including "Limits of Liability."

21.     Power and Mitchell provided Progressive with a WCTL Report for Plaintiff's Vehicle on or about July 30, 2019 ("Plaintiff's Report").  A true and correct copy of Plaintiff's Report is attached and incorporated herein as Exhibit B.

22.     As reflected by Plaintiff's WCTL Report, WCTL Reports first calculate a purported base vehicle value by averaging the adjusted prices of the comparable vehicles ("Base Value").  The WCTL Report then makes purported adjustments for the condition of the vehicle ("Condition Adjustment"), prior damage, aftermarket parts, and refurbishment which are deducted from Base Value to calculate "Market Value" as reflected in the WCTL Reports.  The great majority of WCTL Reports include a downward Condition Adjustment.

23.     Plaintiff's Report purports to state a Base Value for his Vehicle in the amount of $8,586.12 and a Market Value of $6,609.84 after a negative Condition Adjustment in the amount of $1,976.28 (before applying his deductible in the amount of $1,000.00).  The Market Value in Plaintiff's Report wrongly deprived Plaintiff of $1,976.28, based upon the downward Condition Adjustment, which is statistically invalid.

24.     In addition, the Base Value from which the Condition Adjustment amount was deducted is also based on statistically invalid WCTL methodology, as explained in Section B below.  Accordingly, the Actual Cash Value of Plaintiff's Vehicle was substantially and improperly understated as a result of the statistically invalid WCTL Report.

25.     Plaintiff's Report failed to properly value Plaintiff's Vehicle and did not properly pay the Actual Cash Value that Progressive owed to Plaintiff.

26.     As a direct result of statistically invalid WCTL Reports, Progressive has intentionally and materially underpaid the total loss claims of Plaintiff and the Class Members.

**B.     The Mitchell and Power Partnership and WCTL Methodology**

27.     Mitchell and Power entered into a partnership to provide WCTL Reports to insurers, including Progressive.

28.     The partnership between Mitchell and Power is described (the "WCTL Methodology") in each of the WCTL Reports as follows:

> WorkCenter Total Loss was designed and built in conjunction with J.D. Power's experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D. Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

Exhibit B at p. 9.

29.     Additionally, WCTL Reports specifically bear the names of both Power and Mitchell on the first page of each WCTL Report.

30.     Each WCTL Report contains a "Methodology Explanation" which is located on the last page of each WCTL Report.  See Exhibit B, Plaintiff's Report at 9.

31.     The WCTL Methodology assigns actual cash values for total loss vehicles in an amount that is significantly lower than those assigned by published and publicly available valuation models, such as NADA, Black Book, Red Book, and Kelly Bluebook.

32.     The WCTL Methodology is claimed to be a five-step process used to "produce accurate and easy-to -understand vehicle valuations."

33.     This five-step process includes:

Step 1 - Locate Comparable Vehicles

Step 2 - Adjust Comparable Vehicles

Step 3 - Calculate Base Vehicle Value

Step 4 - Calculate Loss Vehicle Adjustments

Step 5 - Calculate the Base Value

Exhibit B at 9 (the "WCTL Valuation").

34.     None of these steps, relating to comparable vehicles, making vehicle adjustments, and calculating base values, are based on statistically valid methodologies, algorithms, values or computations.  Each step is, in fact, statistically invalid and does not result in a proper valuation for total loss vehicles in Colorado.

35.     Specifically, the WCTL Methodology for identifying comparable vehicles and for making purported "equating" adjustments for equipment, options and mileage is statistically invalid.  (*See* Steps 1 and 2 which result in "Base Vehicle Value" at Step 3).

36.     The Market Values in the WCTL Valuations are known by Progressive to be regularly, materially, and substantially lower than the values for comparable vehicles, and to deny insureds, such as Plaintiff and the Class, a proper cash value amount sufficient for its insureds to purchase a comparable replacement vehicle.

37.     The WCTL Methodology for making downward Condition Adjustments, which is a major aspect of the fraudulent scheme to under-value total losses, and the other "Vehicle Adjustments" is statistically invalid.  (*See* step 4).

38.     Specifically, the dollar amounts assigned to Condition Adjustments in the WCTL Reports are wholly arbitrary and are not based on any statistical, objective, valid,

or verifiable data.  Accordingly, all such downward Condition Adjustments are improper in all respects and should be disregarded in properly valuing a Progressive insured's total loss vehicle.

39.     The intended and wrongful result of the five steps and sub-steps included in the Progressive Policy is that total loss vehicles are undervalued, and Progressive insureds' total loss claims are underpaid. This underpayment is a detriment to Progressive insureds, including Plaintiff and the Class, and a benefit to Defendants.  Rather than paying Plaintiff and the Class members the proper sums of money for their total loss vehicles, Progressive has retained significant funds in the millions of dollars by underpaying Plaintiff and Class Members for the value of their total loss vehicles.

40.     The WCTL Reports routinely provide Progressive total loss vehicle values which are *not intended* to yield an appropriate Actual Cash Value for Plaintiff's Vehicle or comparable vehicles but are calculated to yield a substantially lesser and improper amount.

41.     The majority of Progressive's first-party total loss claims in Colorado are settled based on the WCTL  Valuations.

## C.     Progressive's Use of the Unlawful WCTL Valuations

42.     Progressive contracted with Mitchell to receive the WCTL Reports prepared by the Power/Mitchell partnership methodology.

43.     Mitchell provided Progressive with Reports for the total loss vehicles of the Plaintiff and the Class.

44.     Progressive has a regular practice of knowingly and falsely informing insureds that the WCTL Reports properly establish Actual Cash Value of their vehicles and provide the basis for proper payment of total loss claims under Progressive Policies in Colorado.

8

45.     Progressive has the regular and systemic claims practice of demanding that insureds settle total loss claims based upon the WCTL Reports and refusing to negotiate the Market Values in the WCTL Reports with the insureds.

46.     Progressive has actual knowledge that the WCTL Methodology is statistically invalid and unlawful.

47.     Progressive has suppressed and concealed material facts relating to WCTL's market valuation system and its pre-existing scheme in conspiracy with Power and Mitchell to intentionally undervalue total loss claims, including those of Plaintiff and the Class. Specifically, Progressive concealed from Plaintiff that its purported total loss valuations were based upon the statistically invalid and unlawful WCTL Valuation Methodology.

48.     Plaintiff and the Class members have been damaged by Progressive's systemic underpayment of total loss claims.  This underpayment results from Progressive's intentional failure to fairly and properly determine Actual Cash Value and its knowingly improper downward Condition Adjustments.

49.     Progressive has knowingly and intentionally acted in bad faith towards its Colorado insureds in regularly and routinely utilizing WCTL Reports to adjust total loss claims.

### D.     Guidebook Values

50.     Other entities involved in the automobile business, such as new and used car dealers, also banks and other lending institutions, have *never* used WCTL Reports as a basis for determining a fair valuation or Actual Cash Value of used vehicles.

51.     Such entities have historically used industry-recognized guidebooks as sources for proper used vehicle valuation ("Guidebooks").  These Guidebooks include NADA, Kelly Blue Book and Black Book.  These Guidebooks are a proper source for determining Actual Cash Value.

52.     Historically, insurers also used Guidebooks for the purpose of determining proper valuations of total loss vehicles and Actual Cash Value.  Indeed, many insurers continue to use the Guidebooks to determine Actual Cash Value when determining whether a vehicle can be repaired or must be declared a total loss.

53.     For example, insurers typically declare a vehicle to be a total loss if the estimated repair costs exceed either the value of the vehicle or a percentage, such as 80%, of the pre-loss vehicle valuation.

54.     It is typically in the insurer's best interest to establish a higher value of the vehicle for this purpose, so that the cost of repair is a smaller percentage of the pre-crash vehicle valuation.

55.     However, a number of years ago, insurers including Progressive determined that they could save substantial amounts of money by using third-party valuations prepared by either Power/Mitchell or another third-party valuation company, CCC Information Services ("CCC").

56.     Accordingly, in the last twenty years, many insurers have adopted the regular practice of using WCTL or CCC valuations of total loss vehicles, and disregarding the historically-recognized Guidebooks as a source of valuation, to improperly save millions of dollars in adjusting total loss claims.

57.     The WCTL Reports are not used or recognized by any other "player" in the automobile industry, including dealers or lending institutions.

**E.      Progressive Has Waived and is Estopped to Assert the Appraisal Provision**

58.     Progressive's Preexisting Appraisal Scheme:  During the relevant period of time, Progressive had, and continues to have, a standard practice of refusing to negotiate the Base Vehicle Value and "Market Value" as reflected in the WCTL Reports unless WCTL Report has, for example, omitted an option.  Specifically, Progressive has a regular practice of refusing to

negotiate in good faith with respect to comparable vehicles, mileage adjustments for comparable vehicles, condition adjustments to the specific total loss vehicle, or comparable vehicle condition adjustments.   Specifically, Progressive typically routinely will not negotiate either the Base Vehicle Value or Market Values of total loss vehicles.

59.     Progressive knows that its insureds typically have no practical choice other than to accept the total loss payment offered by Progressive simply because the insured needs those monies to purchase a replacement vehicle.

60.     Further, an insured cannot wait on the appraisal process.  Progressive also has a regular practice of threatening to withdraw its offer to pay a total loss if the insured requests an appraisal.  An appraisal process, including selection of an umpire may take forty-five (45) days or more.

61.     This threat of withdrawal of its offer, combined with delay and expense to the insured of an appraisal, as explained below, present bad faith obstacles to a fair appraisal. Progressive simply "stands pat" unless it is sued.

62.     Progressive knows that if Progressive insists on "standing" on the WCTL Valuation, the great majority of insureds will simply capitulate and take the Progressive total loss payment.

63.     Progressive also had, and continues to have, a regular practice that Progressive does not demand an appraisal unless and until an insured files a lawsuit.  Progressive does not include the appraisal provision in its policies for the appropriate purpose of a cheap and efficient resolution, on a timely basis, of disputed first-party total loss claims.  As stated, even where there is a clear and material dispute with an insured, Progressive does not demand an appraisal unless a lawsuit is filed.

64.     Prejudice to Plaintiff Ubel and Class Members:  Progressive's scheme to not invoke the appraisal unless and until there is litigation materially prejudices Progressive insureds, including Plaintiff and the Class, in several material ways.

65.     First, Progressive typically sells the salvaged total loss vehicle to one of two companies, Copart or IAA.  These companies pay a salvage value to Progressive and then market salvaged parts from total loss vehicles.  The total loss vehicle is typically sold by Progressive and salvaged for spare parts in thirty (30) to forty-five (45) days after the total loss.

66.     Progressive has actual knowledge that if an insured disputes Progressive's total loss payment but does not demand an appraisal, the total loss vehicle will be unavailable for inspection and appraisal after such salvage.  Thus, Progressive knows that if it does not request an appraisal for months or even years, and then does so only if and when litigation is filed against Progressive, the total loss vehicle will be unavailable for physical inspection and appraisal. Consistent with Progressive's practice, Plaintiff's Vehicle was salvaged and is not available for an inspection.

67.     Progressive also knows that industry-recognized information regarding comparable used vehicles listed for sale at the time of a loss from sources such as AutoTrader and Cars.com is no longer current after about ninety (90) days.

68.     The only possible appraisal after the vehicle has been salvaged is what is known in the industry as a "desktop" appraisal, which is based upon the limited information available a year or two years after the total loss.

69.     The prejudice to insureds such as Plaintiff is clearly illustrated by the information regarding the "vehicle condition," which is listed in WCTL Reports.  See Exhibit B at 4. Consistent with its standard practice, the WCTL Reports list purported "component condition" for

"interior" (including headliner, glass, dash/console, seats and carpet), "exterior" (including body vinyl/convertible top, trim and paint), "mechanical" (including engine and transmission) and "tires."

70.     When the vehicle is unavailable at the time that Progressive demands an appraisal, it is impossible to fairly review the actual condition of each of the listed "component" conditions based upon an inspection.  Thus, Plaintiff has been deprived of the right to proper inspection-based appraisal as a result of Progressive's delay and the salvage of his vehicle.

71.     Cost as a Deterrent to an Appraisal:  In addition, the appraisal provision in the Policy requires that the insured pay for the cost of an appraiser and share the expense of a third-party umpire.  This provision is intended by Progressive to be and is, in fact, a significant and improper deterrent to insureds such as Plaintiff with regard to invoking the appraisal provision. This is because the cost to Plaintiff of an in-person inspection by an appraiser, plus the fees and expenses of a third-party umpire, may well exceed $1,000.

72.     For all these reasons, based upon its pre-existing scheme regarding untimely utilization of the appraisal provision and the clear prejudice to insureds such as Plaintiff, Progressive has waived and are estopped from invoking the appraisal provision in the Plaintiff's Policy.

## CLASS ALLEGATIONS

73.     Plaintiff brings this class action individually and on behalf of all others similarly situated, for all claims alleged herein, pursuant to Colo. R. Civ. P. 23(a), (b)(2) and (b)(3):

> All persons and entities that made first party claims on or after December 8, 2013 under an automobile insurance policy issued within the State of Colorado by Progressive and whose vehicles were declared a total loss by Progressive and were valued using WCTL's total loss valuation system.

74.     Plaintiff excludes from the Class Defendants, all related entities, subsidiaries or affiliates of said Defendants, any entity in which said Defendants have a controlling interest, and any and all of Defendants' employees, affiliates, legal representatives, heirs, successors, or assignees.

75.     Plaintiff also excludes from the Class any person or entity that has previously commenced and resolved a lawsuit against said Defendants arising out of the subject matter of this lawsuit.

76.     Plaintiff also excludes from the Class the Judge assigned to this case and any member of the Judge's immediate family.

77.     **The Condition Adjustment Subclass:** One subclass consists of insureds whose total loss claims were reduced by negative or downward Condition Adjustments.

78.     **The Base Value Subclass:** A second subclass consists of all insureds whose vehicles received WCTL Reports with Market Values which were less than Actual Cash Value as established by Guidebooks.

79.     **Numerosity:** The Class is so numerous that joinder of all affected persons would be impracticable. Although the exact number of Class members is unknown to Plaintiff, the Class is estimated to comprise many thousands of people who have sustained total losses to their vehicles while insured by Progressive.

80.     **Commonality:** Numerous questions of law and fact are common to Plaintiff and the Class, and predominate over any individual questions. These legal and factual questions include, but are not limited to:

        a)      Whether Progressive failed to properly investigate and determine that WCTL Valuations are statistically invalid;

b)       Whether Progressive had actual knowledge that WCTL Valuations are statistically invalid;

c)       Whether Colorado law required Progressive to pay Actual Cash Value to its Colorado insureds;

d)       Whether Progressive's Policy required it to pay Actual Cash Value to its Colorado insureds.

e)       Whether Progressive breached its contracts of insurance with its Colorado insureds by improperly underpaying total loss claims through the use of statistically invalid Power/Mitchell WCTL Valuations;

f)       Whether Progressive failed to pay actual cash value to its Colorado insureds;

g)       Whether WCTL Valuations properly calculate the actual cash value of total loss vehicles at the time of the loss;

h)       Whether Progressive has intentionally, and systemically underpaid total loss claims to Plaintiff and the Class by using statistically invalid WCTL Valuations;

i)       Whether Plaintiff and the Class have sustained damages;

j)       Whether Defendants have been unjustly enriched as a result of the scheme described herein; and,

k)       Whether Progressive, Power and Mitchell have conspired, as alleged herein.

81.    **Typicality:** Plaintiff's claims are typical of the claims of the Class members, as Plaintiff and all members of the Class have suffered damages as a result of Defendants' unlawful and deceptive scheme of settling total loss vehicle claims for substantially less than the actual

replacement costs of such vehicles. Specifically, the total loss claims of the Class members were adjusted by Progressive based upon WCTL Valuations. The same discovery and evidence that would be used to support Plaintiff's claims will be used to support the claims of the members of the Class.

82. **Adequacy of Representation:** Plaintiff will fully and adequately represent and protect the interests of the Class members because they share common injuries as a result of Defendants' conduct that is applicable to all members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions. Plaintiff and counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests that are contrary to or in conflict with those of the Class they seek to represent.

83. **Predominance and Superiority:** This action is properly maintained as a class action because questions of law and fact common to Plaintiff's claims and the claims of the members of the Class predominate over questions of law and fact affecting only individual members of the Class, such that a class action is superior to other methods for the fair and efficient adjudication of this controversy. The issues in relation to Plaintiff's claims are similar to the issues relating to the claims of the other members of the Class, such that a class action provides a far more efficient method to resolve the claims rather than a myriad of separate lawsuits. Indeed, for most Class members, a class action is the only mechanism by which they could reasonably expect to vindicate their rights. Certification of the Class is also supported by the following considerations:

a) The relatively small amount of damages that members of the Class have suffered on an individual basis would not justify the prosecution of separate lawsuits;

b)      Counsel in this class action are not aware of any other earlier litigation against Defendants to which any other members of the Class are a party and in which any question of law or fact controverted in the subject action has been or is to be adjudicated;

c)      By virtue of Defendants' efforts to conceal their scheme, many Class Members may not even be aware that they have a claim;

d)      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action;

e)      Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the courts and the litigants and would further the efficient adjudication of Class Member claims; and

f)      There is no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

84.      Defendants have acted, or refused to act, in a manner that applies generally to the Class, such that final injunctive relief is appropriate as to the Class as a whole.

## DAMAGES FOR THE CLASS

85.      Calculation of damages for the Class is readily manageable. Progressive maintains specific information in its electronic database relating to first-party total loss claims identifying each claim in the amount of any negative or downward Condition Adjustment on each such claim.

86.      In addition, Progressive maintains aggregate data on the total amount of negative or downward Condition Adjustments in Colorado (and other states) on an annual basis.

87.     Accordingly, when the Class establishes that all the Progressive negative or downward Condition Adjustments are statistically invalid, then each member of the Class will be entitled to a refund in the full amount of any such Condition Adjustment. As stated, that amount can be readily determined on an individual basis for each Progressive first-party insured as well as on an aggregate basis.

88.     All the damages claimed in this action on a class-wide basis are readily and easily ascertainable from the Progressive electronic database relating to its Colorado total loss claims.

### First Claim For Relief – Breach of Contract
### (Against Defendant Progressive)

89.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 as though fully set forth herein.

90.     The Progressive Policy issued to Plaintiff constitutes a valid and binding contract.

91.     Progressive has breached its Policy with Plaintiff in multiple ways, resulting in the material underpayment of Plaintiff's total loss claims, which include, but are not limited to: (a) failure to properly investigate and confirm the statistical validity of the WCTL Methodology; (b) improper delegation of its obligation to value total loss vehicles, including Plaintiff's vehicle, to WCTL; and (c) wrongful failure to properly adjust and pay the amounts due and owed to Plaintiff for his total loss vehicle, sufficient for Plaintiff to obtain a comparable replacement vehicle.

92.     Specifically, Progressive has failed to pay Actual Cash Value as required by its Policy to Plaintiff and to Class members.

93.     Progressive's breach proximately caused Plaintiff's actual damages and the actual damages of the Class. Thus, Progressive is liable for compensatory, consequential and incidental damages flowing from its breach of the Policy, as well as attorneys' fees and interest.

94.     This claim applies to all Class Members.

## Second Claim For Relief - Bad Faith
**(Against Defendant Progressive)**

95.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 as though fully set forth herein.

96.     The Progressive Policies obligated Progressive to properly and reasonably investigate the fair value of the total losses sustained by each such policyholder, including Plaintiff, and then pay that amount in a timely manner. The Progressive Policies also obligated Progressive to act in good faith and to deal fairly with Plaintiff in handling and adjusting his total loss claim.

97.     Instead of properly investigating and paying Plaintiff's total loss claim, Progressive contracted with Power and Mitchell and utilized the WCTL Valuations for the wrongful and bad faith purpose of intentionally and improperly reducing total loss payments to Plaintiff and the Class, in an improper attempt to save money at the expense of Progressive insureds, including Plaintiff and the Class.

98.     Progressive has actual knowledge that the WCTL Valuation Methodology is statistically invalid.

99.     Progressive's conduct in "low balling" Plaintiff's claim, intentionally undervaluing Plaintiff's claim, and withholding the full value of that claim, is unreasonable and unjustifiable under the circumstances, and constitutes bad faith under law.

100.    Progressive has acted in bad faith in adjusting Plaintiff's claim and the total loss claims of Class Members in a systemic and uniform manner by making statistically invalid downward Condition Adjustments based upon WCTL Valuations.

101.    Plaintiff has suffered damages as a direct and proximate result of such unreasonable, bad faith conduct on the part of Progressive and is, therefore, entitled to recover

compensatory damages, as well as any other such damages, costs or attorneys' fees Plaintiff may be entitled under Colorado law.

102. This claim applies to all Class Members.

### Third Claim For Relief - Tortious Interference with Performance of a Contract (Against Defendants Power and Mitchell)

103. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 as though fully set forth herein.

104. The Progressive Policies obligated Progressive to properly investigate the value of Plaintiff's total loss claim using a fair and statistically valid valuation system or methodology, and then to properly pay Plaintiff the appropriate value of his total loss.

105. At all times relevant hereto, and based on Mitchell's contract with Progressive to provide WCTL Reports, Power and Mitchell knew that Progressive entered into such Policies with its insureds and that the Progressive Policies obligated Progressive to promptly and properly pay total loss claims.

106. Power and Mitchell had actual knowledge of the identity of Plaintiff and each Class Member as Progressive insureds. This knowledge is demonstrated by the fact that Power and Mitchell prepared the Plaintiff's WCTL Report, which specifically identified Plaintiff and valued Plaintiff's Vehicle. The same is true for the WCTL Reports of the other Class Members.

107. Power and Mitchell had actual knowledge that Progressive used the WCTL Valuations to adjust the total loss claims of Plaintiff and the Class Members

108. Power and Mitchell also had actual knowledge that Progressive typically would refuse to increase total loss valuations beyond the WCTL Valuations and that Progressive

settled the substantial majority of its total loss claims based upon WCTL Valuations provided by Power and Mitchell.

109.    Power and Mitchell wrongfully interfered with Progressive's contractual obligations to Plaintiff by knowingly and intentionally selling to Progressive a statistically invalid and wholly arbitrary total loss valuation product for the specific purpose of enabling Progressive to underpay the claims of total loss insureds, including Plaintiff.

110.    Progressive's breaches that were caused by Power and Mitchell's unjustified, intentional and malicious interference with Plaintiff's contractual rights under the Ubel Policy include:

(a)    failing to properly value Plaintiff's total loss;

(b)    using arbitrary and statistically invalid methodology to value Plaintiff's total loss claim; and

(c)    causing Progressive to fail to pay the proper amount due and owed to Plaintiff.

111.    Plaintiff suffered damages as a proximate result of Power and Mitchell's improper WCTL Valuations and resulting tortious interference with the contractual relationship between Progressive and Plaintiff and the Class. Therefore, Plaintiff is entitled to recover compensatory damages, as well as any other such damages, costs or attorneys' fees to which he may be entitled under Colorado law.

112.    This claim applies to all Class Members.

**Fourth Claim For Relief - Breach of Contract Arising from Plaintiff's Status as Third-Party Beneficiary of the Agreement between Power/Mitchell and Progressive**
**(Against Defendants Power and Mitchell)**

113.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 as though fully set forth herein.

114.     At all times relevant hereto, Mitchell, through its joint venture with Power, contracted to provide Progressive with total loss valuations (the "Agreement"). The intended purpose of this Agreement was to outsource Progressive's valuation of total loss claims for the purpose of satisfying the obligations of Progressive to value and pay total loss claims.

115.     As insureds for whom valuations were prepared under this Agreement, Plaintiff and the Class are intended beneficiaries of the Agreement between Progressive and Mitchell and are entitled to sue for breach of that Agreement.

116.     Power and Mitchell breached this Agreement by providing Progressive with total loss valuations that were not statistically valid and were wholly arbitrary in the manner in which Progressive valued total losses, including Plaintiff's total loss. The improper WCTL Valuations were supplied to Progressive by Mitchell in the course of business for the purported direct benefit of Plaintiff and the Class.

117.     Mitchell's breach of its Agreement to provide valid total loss valuations to Progressive proximately caused damage to Plaintiff. Mitchell is, therefore, liable to Plaintiff and the Class as intended third-party beneficiaries for compensatory and consequential damages flowing from said breaches.

118.     Power is likewise liable for Mitchell's breach of its Agreement with Progressive based upon its actual involvement with the WCTL Methodology and its partnership with Mitchell.

119.     This claim applies to all Class Members.

**Fifth Claim For Relief - Civil Conspiracy**
**(Against Defendants Progressive, Power and Mitchell)**

120.     Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 as though fully set forth herein.

121.    Power, Mitchell and Progressive entered into an illicit agreement and conspiracy to utilize WCTL Valuations to provide improper total loss valuations. Specifically, Progressive and Mitchell conspired to underpay Plaintiff and the Class by using WCTL Valuations, which included the aforementioned statistically invalid Five Steps (and sub-steps), which were not intended to calculate the fair value of total loss vehicles, but rather to improperly undervalue total loss claims of Progressive insureds.

122.    Power is a part of the conspiracy by reason of its partnership with Mitchell and its participation with Mitchell in building the WCTL Valuations for use by Progressive and other insurers.  Mitchell's role in the conspiracy is evidenced by its Agreement with Progressive and its partnership with Power.

123.    Progressive is a part of the conspiracy by reason of having actual knowledge that the WCTL Valuations provided through its partnership with Power and Mitchell were statically invalid and continuing to utilize the WCTL Valuations when determining the payment of Plaintiff and Class Members' total loss claims.

124.    Progressive's conspiracy with Power and Mitchell to use the invalid WCTL Valuation Methodology deprived Plaintiff and the Class of the proper value of their total losses.  The overt acts emanating from Defendants' illicit agreement to so deprive Plaintiff and the Class include, but are not limited to, Power and Mitchell's undervaluation of Plaintiff's claim using WCTL Valuations, and Progressive's failure to properly investigate, adjust and pay such claim directly resulting from the WCTL Valuations.

125.    Plaintiff and Class Members have been damaged as a proximate result of Defendants' illicit agreement and conspiracy. Therefore, Power, Mitchell and Progressive are each liable for the torts of one another arising out of their conspiracy as defined herein, and

Plaintiff and Class Members are entitled to recover compensatory damages against Progressive, Power and Mitchell.

126.    This claim applies to all Class Members.

### Sixth Claim for Relief – Unjust Enrichment
### (Against Defendants Power and Mitchell)

127.    Plaintiff incorporates by reference the allegations in Paragraphs 1 through 88 as though fully set forth herein.

128.    Plaintiffs and Class Members conferred a monetary benefit upon Power and Mitchell in the form of monies paid for services to Progressive.

129.    Power and Mitchell appreciated or had knowledge of the benefits conferred upon them by Plaintiff and Class Members through their partnership to provide WCTL Reports to Progressive.  The Power and Mitchell partnership and WCTL Methodology was a fraudulent scheme to under-value total losses making it unjust for them to retain the benefit of their scheme at Plaintiff's and Class Member's expense.

130.    Under principals of equity and good conscience, Power and Mitchell should not be permitted to retain the monies they gained at the expense of Plaintiffs and Class Members through Progressive's use of their WTCL Methodology and Reports.  Defendants Power and Mitchell have benefited and continue to benefit through Progressive's use of their WTCL Methodology and Reports at the expense of Plaintiff and Class Members.

131.    Power and Mitchell should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by them at Plaintiffs and Class Member's expense.

## **Prayer for Relief**

**WHEREFORE,** Plaintiff, Todd Ubel, respectfully requests that this Honorable Court, for himself and all Class Members:

A.      Certify the Class alleged herein;

B.      Appoint Plaintiff as Class Representative;

C.      Appoint the undersigned as Class Counsel;

D.      Award Plaintiff and Class Members actual damages in such amount as the Court or jury may determine;

E.      Award declaratory and injunctive relief as permitted by law;

F.      Statutory interest from the date this cause of action accrued or as otherwise allowed by law;

G.      Award reasonable attorneys' fees, filing fees, expert fees, litigation costs and expenses, and court costs to counsel based upon the benefit received by Plaintiff and the Class; and

H.      Award Plaintiff and Class Members any additional relief as this Court deems just and proper, including injunctive relief to prohibit Progressive from continuing to utilize WCTL Valuations in Colorado.

PLAINTIFFS DEMAND A TRIAL BY A JURY OF SIX.

Dated:  December 8, 2019                    Respectfully submitted,

*/s/ Kevin S. Hannon*
Kevin S. Hannon, #16015
DULY AUTHORIZED SIGNATURE OF
KEVIN S. HANNON ON FILE AT THE HANNON LAW
FIRM, LLC

TO BE ADMITTED PRO HAC VICE

Jonathan H. Waller (*Pending PHV Application*)
**WALLER LAW OFFICE, PC**
2001 Park Place, Suite 900
Birmingham, AL 35203
Telephone: (205) 313-7330
jwaller@waller-law.com

John A. Yanchunis (*Pending PHV Application*)
Jonathan B. Cohen (*Pending PHV Application*)
**MORGAN & MORGAN**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2434
jcohen@forthepeople.com
jyanchunis@forthepeople.com

Plaintiffs' Address
Todd Ubel
7496 County Rd. 10
Fort Lupton, CO 80621

DATE FILED: December 8, 2019 12:49 PM
FILING ID: E6389F117DDF8
CASE NUMBER: 2019CV34661

# EXHIBIT A

PROGRESSIVE
P.O. BOX 31260
TAMPA, FL 33631



PROGRESSIVE™
DIRECT Auto

TODD L UBEL
7496 COUNTY ROAD 10
FORT LUPTON, CO 80621

**Policy Number: 80866811**
Underwritten by:
Progressive Direct Insurance Co
May 10, 2019
Policy Period: May 9, 2019 - Nov 9, 2019
Page 1 of 3

**progressive.com**
**Online Service**
Make payments, check billing activity, update
policy information or check status of a claim.

**1-800-776-4737**
For customer service and claims service,
24 hours a day, 7 days a week.

# Auto Insurance
# Coverage Summary
## This is your Declarations Page
## Your coverage has changed

Your coverage began on May 9, 2019 at 12:01 a.m. This policy expires on November 9, 2019 at 12:01 a.m.

This coverage summary replaces your prior one. Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle, unless the policy contract or endorsements indicate otherwise. The policy contract is form 9611D CO (12/14). The contract is modified by form 4884 (10/08).

## Policy changes effective May 10, 2019

| | |
|---|---|
| Changes requested on: | May 9, 2019 11:28 a.m. |
| Requested by: | Todd L Ubel |
| Premium change: | -$300.51 |
| Changes: | The 2002 NISSAN XTERRA has been removed. |

## Drivers and resident relatives

| | Additional information |
|---|---|
| Todd L Ubel | Named insured |
| Melany R Ubel | |
| Chance/L Ubel | |
| Hope Ubel | |

## Outline of coverage

| General policy coverage | Limits | Deductible | Premium |
|---|---|---|---|
| Uninsured/Underinsured Motorist Bodily Injury | $50,000 each person/$100,000 each accident | | $230 |
| Total general policy coverage | | | **$230** |

Form 6489 CO (08/18)


Continued

Policy Number: 80856811
Todd L Ubel
Page 2   of 3

### 2008 NISSAN ARMADA 4 DOOR WAGON
VIN: **5N1BA08C48N616427**
Garaging ZIP Code: 80621
Primary use of the vehicle:  Pleasure

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $341 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 41 |
| Comprehensive | Actual Cash Value | $1,000 | 114 |
| Collision | Actual Cash Value | $1,000 | 124 |
| Total premium for 2008 NISSAN | | | **$620** |

### 2002 NISSAN PATHFINDER 4 DOOR WAGON
VIN: **JN8DR09Y22W713356**
Garaging ZIP Code: 80621
Primary use of the vehicle:  Commute

Length of vehicle ownership when policy started or vehicle added: At least 1 month but less than 1 year

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $384 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 44 |
| Total premium for 2002 NISSAN | | | **$428** |

### 2005 NISSAN XTERRA 4 DOOR WAGON
VIN: **5N1AN08W05C614787**
Garaging ZIP Code: 80621
Primary use of the vehicle:  Pleasure

Length of vehicle ownership when policy started or vehicle added: Less than 1 month

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $328 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 40 |
| Total premium for 2005 NISSAN | | | **$368** |

### 2006 NISSAN XTERRA 4 DOOR WAGON
VIN: **5N1AN08W36C556062**
Garaging ZIP Code: 80621
Primary use of the vehicle:  Pleasure

Length of vehicle ownership when policy started or vehicle added: Less than 1 month

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $335 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 38 |
| Total premium for 2006 NISSAN | | | **$373** |
| **Subtotal policy premium** | | | **$2,019.00** |
| Colorado Auto Theft Prevention Authority fee | | | 2.00 |
| **Total 6 month policy premium and fees** | | | **$2,021.00** |


Continued

## Important notice

Colorado state law requires you to carry, at a minimum, the following coverages:

Bodily Injury Liability - $25,000 for one person per accident, $50,000 for all persons per accident;

Property Damage Liability - $15,000 per accident;

Medical Payments - $5,000 for one person per accident, unless rejected in writing;

Uninsured/Underinsured Motorist - $25,000 for one person per accident, $50,000 for all persons per accident, unless rejected in writing;

All other coverages listed on this Declarations Page, or any liability coverage limits exceeding those stated above and listed on this Declarations Page are optional, non-mandatory coverages selected by you.

## Premium discounts

| Policy | |
|---|---|
| 80866811 | Home Owner, Online Quote, Multi-Car, Continuous Insurance: Diamond, Paperless and Three-Year Safe Driving |

## Lienholder information

| Vehicle | Lienholder |
|---|---|
| 2008 NISSAN ARMADA 5N1BA08C48N616427 | Gateway One Lending Anaheim, CA 92808 |

## Company officers

Secretary

PROGRESSIVE
P.O. BOX 31260
TAMPA, FL 33631


DIRECT Auto

TODD L UBEL
7496 COUNTY ROAD 10
FORT LUPTON, CO 80621

**Policy Number: 80866811**
Underwritten by:
Progressive Direct Insurance Co
May 10, 2019
Policy Period: May 9, 2019 - Nov 9, 2019
Page 1 of 3

**progressive.com**
**Online Service**
Make payments, check billing activity, update
policy information or check status of a claim.

**1-800-776-4737**
For customer service and claims service,
24 hours a day, 7 days a week.

# Auto Insurance
# Coverage Summary
## This is your Declarations Page
## Your coverage has changed

Your coverage began on May 9, 2019 at 12:01 a.m. This policy expires on November 9, 2019 at 12:01 a.m.

This coverage summary replaces your prior one. Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle, unless the policy contract or endorsements indicate otherwise. The policy contract is form 9611D CO (12/14). The contract is modified by form 4884 (10/08).

## Policy changes effective May 10, 2019

| | |
|---|---|
| Changes requested on: | May 9, 2019 11:28 a.m. |
| Requested by: | Todd L Ubel |
| Premium change: | -$300.51 |
| Changes: | The 2002 NISSAN XTERRA has been removed. |

## Drivers and resident relatives

| | Additional information |
|---|---|
| Todd L Ubel | Named insured |
| Melany R Ubel | |
| Chance/L Ubel | |
| Hope Ubel | |

## Outline of coverage

| General policy coverage | Limits | Deductible | Premium |
|---|---|---|---|
| Uninsured/Underinsured Motorist Bodily Injury | $50,000 each person/$100,000 each accident | | $230 |
| Total general policy coverage | | | **$230** |

Form 6489 CO (08/18)


Continued

Policy Number: 80866811
Todd L Ubel
Page 2 of 3

### 2008 NISSAN ARMADA 4 DOOR WAGON
VIN: **5N1BA08C48N616427**
Garaging ZIP Code: 80621
Primary use of the vehicle: Pleasure

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $341 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 41 |
| Comprehensive | Actual Cash Value | $1,000 | 114 |
| Collision | Actual Cash Value | $1,000 | 124 |
| Total premium for 2008 NISSAN | | | **$620** |

### 2002 NISSAN PATHFINDER 4 DOOR WAGON
VIN: **JN8DR09Y22W713356**
Garaging ZIP Code: 80621
Primary use of the vehicle: Commute

Length of vehicle ownership when policy started or vehicle added: At least 1 month but less than 1 year

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $384 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 44 |
| Total premium for 2002 NISSAN | | | **$428** |

### 2005 NISSAN XTERRA 4 DOOR WAGON
VIN: **5N1AN08W05C614787**
Garaging ZIP Code: 80621
Primary use of the vehicle: Pleasure

Length of vehicle ownership when policy started or vehicle added: Less than 1 month

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $328 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 40 |
| Total premium for 2005 NISSAN | | | **$368** |

### 2006 NISSAN XTERRA 4 DOOR WAGON
VIN: **5N1AN08W36C556062**
Garaging ZIP Code: 80621
Primary use of the vehicle: Pleasure

Length of vehicle ownership when policy started or vehicle added: Less than 1 month

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $335 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Medical Payments | $5,000 each person | | 38 |
| Total premium for 2006 NISSAN | | | **$373** |
| **Subtotal policy premium** | | | **$2,019.00** |
| Colorado Auto Theft Prevention Authority fee | | | 2.00 |
| **Total 6 month policy premium and fees** | | | **$2,021.00** |

Form 6489 CO (08/18)


Continued

Policy Number: 80866811
Todd L Ubel
Page 3 of 3

## Important notice

Colorado state law requires you to carry, at a minimum, the following coverages:

Bodily Injury Liability - $25,000 for one person per accident, $50,000 for all persons per accident;

Property Damage Liability - $15,000 per accident;

Medical Payments - $5,000 for one person per accident, unless rejected in writing;

Uninsured/Underinsured Motorist - $25,000 for one person per accident, $50,000 for all persons per accident, unless rejected in writing;

All other coverages listed on this Declarations Page, or any liability coverage limits exceeding those stated above and listed on this Declarations Page are optional, non-mandatory coverages selected by you.

## Premium discounts

| Policy | |
|---|---|
| 80866811 | Home Owner, Online Quote, Multi-Car, Continuous Insurance: Diamond, Paperless and Three-Year Safe Driving |

## Lienholder information

| Vehicle | Lienholder |
|---|---|
| 2008 NISSAN ARMADA 5N1BA08C48N616427 | Gateway One Lending Anaheim, CA 92808 |

## Company officers

Secretary

Form 6489 CO (08/18)

## PART V—ROADSIDE ASSISTANCE COVERAGE

**INSURING AGREEMENT**

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

**ADDITIONAL DEFINITIONS**

When used in this Part V:
1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
   a. mechanical or electrical breakdown;
   b. battery failure;
   c. insufficient supply of fuel, oil, water, or other fluid;
   d. flat tire;
   e. lock-out; or
   f. entrapment in snow, mud, water or sand within 100 feet of a road or highway.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.**

Coverage under this Part V will not apply to:
1. more than three **covered emergencies** for any single **covered auto** in a six-month period;
2. the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3. installation of products or material not related to the disablement;
4. labor not related to the disablement;
5. labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
6. towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;
7. assistance with jacks, levelers, airbags or awnings;
8. labor or repair work performed at a service station, garage, or repair shop;
9. auto storage charges;
10. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
11. mounting or removing of snow tires or chains;
12. tire repair;

13. disablement that results from an intentional or willful act or action by **you**, **a relative**, or the operator of a **covered disabled auto**;
14. any **covered auto** while being used in connection with **ride-sharing activity**;
15. any **covered auto** while being used in connection with a **personal vehicle sharing program**; or
16. a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement;
which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

## PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;

25

6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;

7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;

8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and

9. authorize **us** to obtain medical and other records.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

### CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you**, a **relative**, or a **rated resident** obtaining a driver's license or operator's permit, or changes in:

1. the number, type or use classification of **covered autos**;
2. the persons who regularly operate a **covered auto**;
3. the persons of legal driving age residing in **your** household;
4. the residents in **your** household;
5. an operator's marital or civil union status;
6. **your** mailing address and **your** residence address;
7. the principal garaging address of any **covered auto**;
8. coverage, deductibles, or limits of liability; or
9. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium

26

charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:

1.  **your** mailing address or **your** residence address;
2.  the principal garaging address of any **covered auto**;
3.  the residents in **your** household;
4.  the persons of legal driving age residing in **your** household;
5.  the persons who regularly operate a **covered auto**;
6.  an operator's marital or civil union status; or
7.  the driver's license or operator's permit status of **you**, a **relative**, or a **rated resident**.

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an accident or loss, if **you** have knowingly and with the intent to defraud:

1.  made incorrect statements or representations to **us** with regard to any material fact or circumstance;

2.   concealed or misrepresented any material fact or circumstance; or
3.   engaged in fraudulent conduct;

at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered. However, if **we** void this policy, this shall not affect coverage under Part I—Liability To Others or under Part III—Uninsured/Underinsured Motorist Coverage, up to the minimum limits required by the financial responsibility law of the state shown on **your** application as **your** residence, for an accident that occurs before **we** notify the named insured that the policy is void. No payment will be made to any person who engages in fraudulent conduct. If **we** void this policy, **you** must reimburse **us** if **we** make a payment.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:
1.   make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2.   conceal or misrepresent any material fact or circumstance; or
3.   engage in fraudulent conduct;

in connection with a requested change **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an accident or loss. However, if **we** void this policy, this shall not affect coverage under Part I—Liability To Others or under Part III—Uninsured/Underinsured Motorist Coverage, up to the minimum limits required by the financial responsibility law of the state shown on **your** application as **your** residence, for an accident that occurs before **we** notify the named insured that the policy is void. No payment will be made to any person who engages in fraudulent conduct. If **we** void this policy, **you** must reimburse **us** if **we** make a payment.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an accident or loss if **you**, in connection with the policy application, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

## PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by the financial institution. If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

28

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Payments made on **your** policy will be applied first to fees, then to premium due.

## CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

**We** will give at least 10 days notice of cancellation if:
1.   we cancel during the first 59 days of the initial policy period; or
2.   the policy is cancelled for nonpayment of premium.

**We** will give at least 30 days notice of cancellation in all other cases.

**We** may cancel this policy for any reason if the notice is mailed within the first 59 days of the initial policy period.

After this policy is in effect for more than 59 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:
1.   nonpayment of premium;
2.   an applicant knowingly made a false statement on the application for this policy or an insured person knowingly and willfully made a false material statement in the submission of any claim under this policy;
3.   **your** motor vehicle registration or operator's license, or that of any operator who either resides in the same household as **you** or who customarily operates a **covered auto**, has been under suspension or revocation during the policy period or, if this is a renewal policy, during its policy period or the 180 days immediately preceding its effective date; or
4.   any other reason permitted by law.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis.

## NONRENEWAL

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, other than for nonpayment of premium, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. Notice will be mailed at least 30 days before the end of the policy period.

## AUTOMATIC TERMINATION

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on a **covered auto**, any similar insurance provided by this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you**, a **relative**, or a **rated resident**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

## LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

## OUR RIGHTS TO RECOVER PAYMENT

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another, to the extent of **our** payment. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights.

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another without **our** written consent, the insured person's right to payment under any affected coverage will no longer exist.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share of collection expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

## SERVICE OF PROCESS

If the insured's whereabouts for service of process cannot be determined through reasonable effort, the insured agrees to designate and irrevocably appoint **us** as the agent of the insured for service of process, pleadings, or other filings in a civil action brought against the insured or to which the insured has been joined as a defendant or respondent in any Colorado court if the cause of action concerns an incident for which the insured can possibly claim coverage. Subsequent termination of the insurance policy does not affect the appointment for an incident that occurred when the policy was in effect. The insured agrees that any such civil action may be commenced against the insured by the service of process upon **us** as if personal service had been made directly on the insured. **We** agree to forward all communications related to service of process to the last-known e-mail and mailing address of the policyholder in order to coordinate any payment of claims or defense of claims that are required.

## JOINT AND INDIVIDUAL INTERESTS

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

## BANKRUPTCY

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy.





9611D CO 1214

DATE FILED: December 8, 2019 12:49 PM
FILING ID: E6389F117DDF8
CASE NUMBER: 2019CV34661

# EXHIBIT B

# Vehicle Valuation Report



Prepared For  Progressive Group of Insurance Companies   (800) 321-9843

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-3250878-01 | | COLLISION | TODD UBEL 7496 COUNTY ROAD 10 FORT LUPTON, CO 80621 +1-720-6414244 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 07/28/2019 | 07/28/2019 | 07/30/2019 | 1009201853 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2008 | Nissan | Armada SE 4 Door Utility 123" WB 5.6L 8 Cyl Flexible A 4WD | CO 80621 | 219,013 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Red Brawn | 165SDL, Colorado | 5N1BA08C48N616427 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $8,586.12 |
| Condition - | $1,976.28 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $6,609.84 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| Settlement Value = | $5,609.84 |

## Settlement Value:
# $5,609.84

Mitchell WorkCenter™ Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2008 Nissan Armada | SE 4 Door Utility 123" WB | 5.6L 8 Cyl Flexible A 4WD

## Standard Equipment

### Exterior

| | |
|---|---|
| Chrome door handles | Chrome pwr heated outside mirrors |
| Flip-out rear quarter windows | Halogen headlights |
| Lower body step rails | Manual rear liftgate w/flip-up glass |
| Rear intermittent wiper | Rear privacy glass |
| Roof rack w/crossbars | Speed-sensitive variable intermittent windshield wipers |
| UV-reducing solar glass windshield | |

### Interior

| | |
|---|---|
| (4) 12V DC pwr outlets | 2nd row 40/20/40 fold-flat split bench seat |
| 3rd row 60/40 fold-flat split bench seat | AM/FM stereo w/in-dash 6-CD/MP3 player-inc: (8) speakers, radio data system (RDS), dual media playback, satellite radio pre-wiring |
| Center console-inc: laptop storage, CD changer, (2) cup holders, specialized storage for pens, tissue, CDs | Cloth seating surfaces |
| Day/night rearview mirror | Delayed pwr retention |
| Digital clock | Dual illum visor vanity mirrors |
| Dual zone auto air conditioning | Front bucket seats-inc: 8-way pwr driver seat w/manual lumbar, fold-flat manual passenger seat |
| Glass & diversity antennae | Instrumentation-inc: speedometer, tachometer, oil temp gauge, fuel gauge, PRND-4-3-2-1 display, oil pressure gauge, 7" color display |
| Interior lighting-inc: (6) overhead dome lights | Leather-wrapped steering wheel w/audio & cruise controls |
| Overhead console w/compass-inc: multiple storage bins for sunglasses, CD/DVD, etc. | Pwr door locks w/illuminated switches |
| Pwr windows w/auto up & down, illuminated switches | Rear air conditioning w/front/rear controls |
| Rear glass defroster | Rear heater duct |
| Rear proximity sensors (reverse sonar) | Rear seat audio controls |
| Remote keyless entry w/remote windows down | Security alarm system |
| Tilt steering column | |

### Mechanical

| | |
|---|---|
| 18" x 8" 5-spoke aluminum alloy wheels | 2-speed transfer case w/4-Low & auto 4x4 |
| 4-wheel anti-lock braking system (ABS) | 4-wheel disc brakes |
| 4-wheel independent suspension | 4-wheel limited slip (ABLS) |
| All-Mode 4-wheel drive | Dual front tow hooks |
| Electronic brake force distribution (EBD) | Front/rear stabilizer bar |
| Full size spare tire | Oil pan skid plate |
| P265/70R18 BSW tires | Vehicle dynamics control system (VDC) |

### Safety



| Child safety rear door locks | Driver & front passenger dual stage airbags -inc: occupant sensor |
|---|---|
| Front seat belts w/pretensioners & load limiters | Lower Anchors & Tethers for Childern (LATCH) |
| Roof-mounted side-impact curtain airbags for all rows | |

## Packages

**[G01] DRIVERS PREFERRED PKG**

-inc: 6-disc in-dash CD changer, XM satellite radio, Bose audio system w/(11) speakers & subwoofer, rear view monitor, front sonar, fog lamps, auto-dimming rearview mirror w/compass & outside temp gauge, HomeLink universal transceiver, pwr liftgate

**[P01] PREMIUM PKG**

-inc: Drivers Preferred Pkg, leather seating surfaces, intelligent key keyless entry & starting system, front seat-mounted side-impact airbags, 6-way pwr passenger seat

**[T01] TOW PKG**

-inc: receiver hitch, 7-pin wiring harness, HD battery, auto leveling rear suspension, 3.36 axle ratio

**[V01] DVD ENTERTAINMENT PKG**

-inc: DVD player w/aux inputs, 8" color monitor, remote control, (2) wireless headphones

## Optional Equipment

| [H97] TOW HITCH | [J01] PWR TILT/GLIDE MOONROOF |
|---|---|
| [L92] FLOOR MATS & CARGO MAT | |

**\*DIO/PIO =**   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2008 Nissan Armada |  SE 4 Door Utility 123" WB | 5.6L 8 Cyl Flexible A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation: **75 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle: **130,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL GAS A 4WD | 69,680 | 80504 | 12 miles | $12,999.00 List Price | $7,050.00 |
| 2 | 2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL GAS A 4WD | 184,461 | 80214 | 29 miles | $8,595.00 List Price | $9,114.22 |
| 3 | 2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL FLEXIBLE A 4WD | 161,840 | 80214 | 29 miles | $8,895.00 List Price | $8,319.41 |
| 4 | 2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL GAS A 4WD | 131,000 | 80223 | 30 miles | $10,995.00 List Price | $9,860.84 |

**Base Value: $8,586.12**

# Loss Vehicle Adjustments

Loss vehicle:  2008 Nissan Armada | SE 4 Door Utility 123" WB | 5.6L 8 Cyl Flexible A 4WD



## Condition Adjustments

Condition Adjustment:  -$1,976.28          Overall Condition:  1.97-Fair          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DASH/CONSOLE | 3 Good | Some permanent marks/soil/stains |
| GLASS | 1 Poor | Damage requires replacement |
| DOORS/INTERIOR PANELS | 3 Good | Some permanent marks/soil/stains |
| HEADLINER | 3 Good | No damage |
| CARPET | 3 Good | moderate wear |
| SEATS | 2 Fair | Large tear/rip |
| **Exterior** | | |
| PAINT | 1 Poor | Extensive stone chipping |
| VINYL/CONVERTIBLE TOP | Typical | N/A |
| TRIM | 2 Fair | More than 2 minor trim damaged/missing |
| BODY | 1 Poor | Severe abuse evident |
| **Mechanical** | | |
| ENGINE | 3 Good | No missing/damaged components |
| TRANSMISSION | 1 Poor | Obvious leak |
| **Tire** | 3 Good | 8 7 7 3 new 12 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

# Comparable Vehicles

Loss vehicle:  2008 Nissan Armada | SE 4 Door Utility 123" WB | 5.6L 8 Cyl Flexible A 4WD

| 1 | **2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL GAS A4WD** | | | **List Price: $12,999.00** |

| VIN | Stock No | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| 5N1AA08C78N600251 | 2019-236 | | 06/08/2019 | 80504 | 12 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

RED'S AUTO & TRUCK

1451 VISTA VIEW DR

LONGMONT CO 80504

303-726-5520

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$935.00 |
| Vehicle Configuration Adjustment | | | $0.00 |
| Mileage | 219,013 | 69,680 | -$5,232.92 |
| Equipment | | | |
| [H97] TOW HITCH | Yes | No | $149.62 |
| [L92] FLOOR MATS & CARGO MAT | Yes | No | $69.30 |
| | | Total Adjustments: | -$5,949.00 |
| | | **Adjusted Price:** | **$7,050.00** |

Comparable Vehicle Package Details:

[P01] PREMIUM PKG

[T01] TOW PKG

[V01] DVD ENTERTAINMENT PKG

Comparable Vehicle Option Details:

[J01] PWR TILT/GLIDE MOONROOF

| 2 | **2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL GAS A4WD** | | | **List Price: $8,595.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5N1AA08C88N610822 | 31041 | 07/18/2019 | 80214 | 29 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

LAKEWOOD HAPPY MOTORS

5900 WEST COLFAX AVENUE

LAKEWOOD CO 80214

866-396-6815

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$618.00 |
| Vehicle Configuration Adjustment | | | $0.00 |
| Mileage | 219,013 | 184,461 | -$596.68 |
| **Equipment** | | | |
| [P01] PREMIUM PKG | Yes | No | $958.07 |
| [T01] TOW PKG | Yes | No | $135.38 |
| [V01] DVD ENTERTAINMENT PKG | Yes | No | $333.24 |
| [H97] TOW HITCH | Yes | No | $98.93 |
| [J01] PWR TILT/GLIDE MOONROOF | Yes | No | $208.28 |
| | | Total Adjustments: | $519.22 |
| | | **Adjusted Price:** | **$9,114.22** |

Comparable Vehicle Option Details:

**[L92] FLOOR MATS & CARGO MAT**

| 3 | **2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL FLEXIBLE A4WD** | | | **List Price: $8,895.00** |

| VIN | Stock No | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| 5N1BA08CX8N607117 | 30812 | | 05/15/2019 | 80214 | 29 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

LAKEWOOD HAPPY MOTORS

5900 WEST COLFAX AVENUE

LAKEWOOD CO 80214

866-396-6815

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$640.00 |
| Mileage | 219,013 | 161,840 | -$1,191.08 |
| **Equipment** | | | |
| [G01] DRIVERS PREFERRED PKG | [P01] PREMIUM PKG | Yes | -$538.84 |
| [P01] PREMIUM PKG | Yes | No | $991.46 |
| [T01] TOW PKG | Yes | No | $140.10 |
| [V01] DVD ENTERTAINMENT PKG | Yes | No | $344.85 |
| [H97] TOW HITCH | Yes | No | $102.38 |
| [J01] PWR TILT/GLIDE MOONROOF | Yes | No | $215.54 |
| | | Total Adjustments: | -$575.59 |
| | | **Adjusted Price:** | **$8,319.41** |

Comparable Vehicle Package Details:

[G01] DRIVERS PREFERRED PKG

Comparable Vehicle Option Details:

[L92] FLOOR MATS & CARGO MAT

| 4 | **2008 NISSAN ARMADA SE 4D SUV 8 5.6 NORMAL GAS A4WD** | | | **List Price: $10,995.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5N1AA08C28N619323 | 8555 | 05/12/2019 | 80223 | 30 miles |

Source

DEALER WEB LISTING - BUILDSHEET - CARS.COM

A&A AUTO - DENVER

1725 W MISSISSIPPI AVE

DENVER CO 80223

303-935-9411

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$791.00 |
| Vehicle Configuration Adjustment | | | $0.00 |
| Mileage | 219,013 | 131,000 | -$2,561.12 |
| Equipment | | | |
| [P01] PREMIUM PKG | Yes | No | $1,225.54 |
| [T01] TOW PKG | Yes | No | $173.17 |
| [V01] DVD ENTERTAINMENT PKG | Yes | No | $426.27 |
| [H97] TOW HITCH | Yes | No | $126.55 |
| [J01] PWR TILT/GLIDE MOONROOF | Yes | No | $266.43 |

|  | Total Adjustments: | -$1,134.16 |
|---|---|---|
|  | **Adjusted Price:** | **$9,860.84** |

Comparable Vehicle Option Details:

[L92] FLOOR MATS & CARGO MAT

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2008 Nissan Armada SE | 4 Door Utility 123" WB 5.6L 8 Cyl Flexible  4WD | $38,300.00 |
| 2008 NISSAN ARMADA SE | 4D SUV 8 5.6 NORMAL GAS A 4WD | $38,300.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

Claim # 19-3250878-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 9